## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

**SHIRLEY J. DAY and KAITLYNN R.
MORRIS, Co-Personal Representatives of
the Estate of Dawn Renee Cameron**

      **Plaintiffs,**

**v.**                                            **Case No: 5:17-cv-153-Oc-32PRL**

**JACOB CHENOWETH**

      **Defendant.**

_____

### REPORT AND RECOMMENDATION[1]

This case involves the death of Dawn Renee Cameron on the evening of November 16, 2014. Earlier that night, Jacob Chenoweth, a deputy with the Citrus County Sheriff's Department responded to a call regarding an altercation at a trailer park community involving Ms. Cameron and two residents. Upon his arrival at the scene, Deputy Chenoweth encountered Ms. Cameron. A physical altercation ensued during which Deputy Chenoweth shot Ms. Cameron, causing her death.

Plaintiffs, Shirley J. Day, the decedent's mother, and Kaitlynn R. Morris, the decedent's daughter, acting in their role as co-personal representatives of the decedent's estate, filed this wrongful death action pursuant to 42 U.S.C. § 1983 against Deputy Jacob Chenoweth in his individual capacity.[2] Plaintiffs allege that Deputy Chenoweth used excessive force against Ms. Cameron. Deputy Chenoweth has moved for summary judgment asserting qualified immunity.

---

[1] Within 14 days after being served with a copy of the recommended disposition, a party may file written objections to the Report and Recommendation's factual findings and legal conclusions. *See* Fed. R. Civ. P. 72(b)(3); Fed. R. Crim. P. 59(b)(2); 28 U.S.C. § 636(b)(1)(B); Local Rule 6.02. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1.

[2] In the initial complaint, Plaintiffs also sought relief against Citrus County, Florida, Ron Kitchen, Chairman of the Board of County Commissioners, and Sheriff Jeffrey J. Dawsy. (Doc. 1).

As explained below, I submit that summary judgment should be granted because Deputy Chenoweth is entitled to qualified immunity.

## I.   UNDISPUTED MATERIAL FACTS

On the evening of November 16, 2014, Deputy Chenoweth was assigned to road patrol. (Doc. 45-1, Affidavit of Jacob Chenoweth, at ¶¶ 3&4). He received a call at approximately 10:55 p.m. from dispatch regarding a complaint of a disturbance at a trailer park community at 550 N. Independence Highway, Inverness, Florida. *Id.* at ¶ 4. According to the call, a white female had battered two people and attempted to light a truck on fire. *Id.*

Upon his arrival at the trailer park at 10:58 p.m., Deputy Chenoweth made contact with a while female at the entrance, who matched the description of the suspect. *Id.* at ¶ 5.   It was Ms. Cameron. Deputy Chenoweth exited his patrol vehicle and asked Ms. Cameron what was going on. *Id.* at ¶ 6. She stated that she had just "kicked in a door" and "beat some guy's ass because she was tired of him sexually assaulting" and that she tried to burn his truck. *Id.* Ms. Cameron then stated that she had to go and started to walk away from the community towards Independence Highway. *Id.* Deputy Chenoweth extended his arm out in front of Ms. Cameron and told her that she could not leave until he figured out what was going on. *Id.*

According to Deputy Chenoweth, Ms. Cameron swung her right arm and attempted to punch him, but she missed and her arm wrapped around his neck. *Id.* at ¶ 7. Deputy Chenoweth then utilized a leg sweep that caused them both to fall to the ground. *Id.* at ¶ 8. Deputy Chenoweth was on top of Ms. Cameron trying to handcuff her, but he was not successful because Ms. Cameron had a jacket or sweater that kept getting in the way. *Id.* Ms. Cameron rolled over and they were face to face. *Id.* at ¶ 9. She began frantically grabbing at his shirt, belt, firearm, and Taser. *Id.* Deputy Chenoweth attempted to roll Ms. Cameron back over, but she rolled out from underneath

him. *Id.*

According to Deputy Chenoweth, when he rolled over, Ms. Cameron was standing up over top of him. *Id*. Her arm was out and she appeared to be pointing a firearm-type object at him. *Id*. She said, "You done it now, mother-fucker. You're going to get it." *Id.* Deputy Chenoweth then reached for his Taser but it wasn't there. *Id.* He drew his weapon and fired four times, striking Ms. Cameron four times.[3] Ms. Cameron fell to the ground. Deputy Chenoweth then retrieved his radio that had fallen off during the scuffle and called shots fired and had EMS respond Code 2 which is lights and sirens. *Id*. at ¶ 10. He then gave verbal commands to the decedent to "show me your hands." *Id*. at ¶ 12. The whole encounter occurred within minutes after Deputy Chenoweth exited his vehicle. *Id*. at ¶ 11.[4]

The first officer on the scene was off-duty Citrus County Sergeant Raymond Fischer, who lived near the trailer park and responded because his children and mother-in-law had heard gunshots. (Doc. 45-2, Deposition of Raymond Fischer, pp. 11-15). As he approached the scene, Sergeant Fisher saw Deputy Chenoweth's patrol vehicle with the door open. *Id*. at p. 16, lines 4-7. According to Sergeant Fischer, it looked like Deputy Chenoweth was kneeling or getting up from being on the ground and he was pointing his gun towards his vehicle. *Id*. at p.16, line 20-p.18, line 3. As he got closer, he saw Ms. Cameron on the ground, about 6-10 feet from Deputy Chenoweth. *Id.* at p. 19, line 15- p. 20, line 4. Sergeant Fisher asked Deputy Chenoweth what happened and he said that Ms. Cameron had attacked him or jumped on him. *Id.* at p.21, lines 6-

---

[3] Plaintiffs contends that Defendant shot Cameron five times. However, a review of the record shows that although Plaintiff had five bullet wounds, there were only four bullets. Indeed, the FDLE report states that 4 fired casings were collected (Doc. 51-6 at 13) and the Autopsy Report states that while there were five bullet wounds, the paths of the wounds through the left arm and chest are consistent with a single bullet. (Doc. 51-2 at 4-5). There is no physical evidence suggesting that five bullets were fired. Plaintiffs cannot create an issue of fact by misstating the record evidence.

[4] According to the Detail Call For Service Report (Doc. 46-1), Deputy Chenoweth was dispatched to the scene at 22:55:33 and arrived at 22:58:28. He contacted dispatch to request EMS at 23:00:00.

9. Sergeant Fischer told him to secure her in handcuffs and offered to cover him. *Id.* at p. 21, lines 6-21. Deputy Chenoweth kicked the Taser from Ms. Cameron's hand while he handcuffed her. *Id.* at p. 21, line 16 – p. 22, line 16, p. 24, lines 2-17; Chenoweth Affidavit at ¶12. Lab results for the Taser showed a mixture of DNA of at least two individuals, but it could not be interpreted due to its complexity. (Doc. 51-6 at 14).

Shortly thereafter, Deputy Jonathan Ritli arrived on scene. He observed Deputy Chenoweth in uniform, bent over with his hands on his knees looking disheveled, with his radio mic hanging off of his shoulder. (Doc. 45-3, Deposition of Jonathan Ritli, p. 12, lines 6-10). He asked Deputy Chenoweth if he was injured and checked Ms. Cameron for a pulse, but she did not have one. *Id.* at p. 17, lines 1-25. Deputy Lisa Ventimiglia then arrived on scene. She checked on Ms. Cameron, found a pulse and administered aid. (Doc. 45-4, Deposition of Lisa Ventimiglia, pp. 14-16). Once EMS arrived, Ms. Cameron's care was turned over to EMS. *Id.* at 16, lines 18-21. Ms. Cameron died of multiple gunshot wounds. A toxicology report revealed amphetamines and methamphetamines in her blood at the time of death. (Doc. 45-6).

Florida Department of Law Enforcement investigated the incident. (Fischer Deposition p. 27, lines 5-6; Doc. 51-6). Deputy Ritli canvassed neighboring houses for witnesses, but no one had seen or heard the events leading up to the gunshots. (Ritli Deposition, p. 23, lines 14-15). Deputy Ventimiglia canvassed the trailer park for witnesses. She interviewed Mr. and Mrs. Lanier who told her that Ms. Cameron had broken into their residence, struck Mr. Lanier, and attempted to light their vehicle on fire. (Ventimiglia Deposition, p. 22, lines 4-24). She also interviewed the resident of Lot #10 who stated that she had heard three shots and someone yell, "let me see your hands." *Id.* at p. 25, lines 19-20.

Lisa Strickland was inside her home when she heard a gunshot. (Doc. 45-4, Deposition of

Lisa Strickland, pp. 7-9). After hearing a second gunshot, she and her husband ran to their front door. Ms. Strickland went out the front door and saw Deputy Chenoweth from behind his patrol vehicle. *Id*. at p. 17, lines 7-21. She could only view the upper half of his body from the shoulders up. *Id.* at p. 18, lines 2-4. He was in a squatting position, but Ms. Strickland could not tell if he had both or only one knee on the ground. *Id.* at p. 17, lines. 7-12. Deputy Chenoweth was leaned over and pointing his gun and firing. She heard three more shots, but never saw or heard Ms. Cameron. *Id*. at p. 21, lines 23-25. Ms. Strickland heard Sergeant Fischer yell out, "is everything ok over there?" *Id.* at p.23, lines 11-13. Deputy Chenoweth responded, "No Sarge, you got any handcuffs on you? Hurry, hurry, you got any hand cuffs on you." *Id.,* p. 23, lines 14-15. Sargeant Fischer ran over to Deputy Chenoweth. *Id*.

## II.   LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In applying this standard, the Court reviews "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits." *Crawford v. Carroll*, 529 F.3d 961, 964 (11th Cir. 2008). The Court considers the "evidence and reasonable factual inferences drawn therefrom in a light most favorable to the non-moving party." *Id.* The moving party bears the initial burden of establishing the nonexistence of a triable issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant is successful on this score, the non-moving party must then come forward with sufficient evidence to establish the existence of the elements on which she will bear the burden of proof at trial. *Id.* at 322-23. The non-moving party may not simply rest on the pleadings, but must use evidence such as affidavits, depositions, answers to interrogatories, or admissions on file to show that there is a genuine issue of material fact that remains for trial. *Id.* at 324.

A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict" for the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Which facts are material depends on the underlying substantive law. *Id.* The Court must view the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the non-movant. *Battle v. Bd. of Regents,* 468 F.3d 755, 759 (11th Cir. 2006). However, "[a] court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'" *Mize v. Jefferson City Bd. of Educ.,* 93 F.3d 739, 743 (11th Cir. 1996).

## III.   DISCUSSION

Section 1983 establishes a cause of action against state officials who violate constitutional rights while acting under color of state law. *See West v. Atkins,* 487 U.S. 42, 49 (1988). Here, Plaintiffs contend that Deputy Chenoweth violated Ms. Cameron's Fourth and Fourteenth Amendment rights by using excessive force in shooting her multiple times causing her death. Deputy Chenoweth asserts entitlement to the defense of qualified immunity.

Under the doctrine of qualified immunity "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). If qualified immunity is applicable, the official is not only immune from damages, but is immune from suit. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). The Supreme Court has explained that the standard of liability is so high that it protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

To receive qualified immunity, a government official must first prove that he was acting within his discretionary authority. *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003). Here, there is no dispute that Deputy Chenoweth was acting within his discretionary authority when he used deadly force to secure Ms. Cameron. Thus, the burden shifts to Plaintiffs to show that qualified immunity is not appropriate. *Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir. 2004)* (a law enforcement officer acts within discretionary authority when he performs a "legitimate job-related function . . . through means that were within his power to utilize.").

The Supreme Court has established a two-part test to determine whether qualified immunity should apply. The first prong requires the court to determine whether the plaintiff's allegations, if true, establish a constitutional violation. *Hope v. Pelzer*, 536 U.S. 730, 736 (2002). The court must determine whether the facts alleged, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a constitutional right. Gonzalez, 325 F.3d at 1234. The second prong requires the court to determine whether the right was "clearly established" at the time of the violation. *Lewis v. City of West Palm Beach, Fla.,* 561 F.3d 1288, 1291 (11th Cir. 2009). These two determinations may be made in either order at the discretion of the court. *Lewis*, 561 F.3d at 1291.

"The Fourth Amendment's freedom from unreasonable searches and seizures . . . encompasses the right to be free from the use of excessive force in the course of an investigatory stop[ ] or other 'seizure' of the person." *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1248 (11th Cir. 2004). "In determining whether the officers' force was reasonable, [a court] must determine 'whether a reasonable officer would believe that this level of force is necessary in the situation at hand.'" *Mercado v. City of Orlando*, 407 F.3d 1152, 1157 (11th Cir. 2005). An officer need have only arguable probable cause to believe that the suspect poses a threat

of serious physical injury, either to the officer or to others. *St. George v. Pinellas Cnty.,* 285 F.3d 1334, 1337 (11th Cir. 2002); *see also Clark v. City of Atlanta, Ga.,* 544 Fed. Appx. 848, 856 (11th Cir. 2013) ("To be entitled to qualified immunity, 'an officer need only have arguable probable cause' to employ deadly force."); *Garczynski v. Bradshaw,* 573 F.3d 1158, 1167 (11th Cir. 2009) ("[A]n officer need only have arguable probable cause, not actual probable cause, in order to qualify for immunity from a Fourth Amendment claim."). This is because the issue is not whether "probable cause existed but whether the officer reasonably believed it existed, based upon the information he or she possessed at the time of the incident." *St. George*, 285 F.3d at 1337. A "reasonable but mistaken belief that probable cause exists for using deadly force is not actionable under § 1983." *Carr v. Tatangelo*, 338 F.3d 1259, 1269 & n.19 (11th Cir. 2003).

"[T]he reasonableness of a 'particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Mercado*, 407 F.3d at 1157 (quoting *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 1872 (1989)). Courts must account "for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386,396-97, 109 S. Ct. 1865, 1872 (1989).

"[T]here is no precise test or 'magical on/off switch' to determine when an officer is justified in using excessive or deadly force." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009) (*citing Scott v. Harris*, 550 U.S. 372, 382, 127 S. Ct. 1769, 1777 (2007)). The use of deadly force is more likely reasonable if:

> the suspect poses an immediate threat of serious physical harm to officers or others; the suspect committed a crime involving the infliction or threatened infliction of serious harm such that his being at large represents an inherent risk to the general public; and the officers either issues a warning or could not feasibly have done so before using deadly force. But . . . none of these conditions are prerequisites to the lawful application of deadly force by an officer seizing a suspect.

*Penley v. Eslinger*, 605 F.3d 843, 851 (11th Cir. 2010) (*citing Scott*, 505 U.S. at 382).

Here, Deputy Chenoweth found himself in a difficult situation. When he first encountered Ms. Cameron, he was responding to a disturbance that involved attempted felony arson and battery. Ms. Cameron admitted that she had just "kicked in a door" and "beat some guy's ass because she was tired of him sexually assaulting" and that she tried to burn his truck. When Deputy Chenoweth ordered here to stay so that he could figure out what had happened, Ms. Cameron took a swing at him. They then struggled on the ground and she frantically grabbed at his shirt, belt, firearm, and taser. Once Ms. Cameron broke free, she stood over Deputy Chenoweth holding what appeared to be a weapon and verbally threatened him, saying, "You done it now, mother-fucker. You're going to get it." Deputy Chenoweth first reached for his taser, but it was missing. Deputy Chenoweth was forced to decide in a matter of seconds whether to employ deadly force.

Under the circumstances, an objective officer in Deputy Chenoweth's position could have believed reasonably that Ms. Cameron posed a threat to his safety. Even if she only held his taser (and not a firearm), it could still be used to incapacitate him or seriously injure him, giving Ms. Cameron access to his firearms (on his person and in his unlocked patrol car). *See e.g., Penley v. Weippert,* 605 F.3d 843, 851 (11th Cir. 2010) (affirmed grant of qualified immunity to law enforcement officer who reasonably thought suspect posed threat of serious physical harm, even though he was armed with only a realistic-looking toy gun). Thus, faced with a "tense, uncertain, and rapidly evolving" situation, Deputy Chenoweth made a split-second decision to shoot Ms.

Cameron to avoid the risk of serious injury. *Graham v. Connor,* 490 U.S. 386,396-97, 109 S. Ct. 1865, 1872 (1989).

Plaintiffs have pointed to arguable discrepancies regarding Deputy Chenoweth's positioning after the shots were fired (i.e., on the ground, kneeling, leaning over), but there is no dispute regarding the circumstances immediately leading up to the shooting. Indeed, Ms. Jakob stated that <u>after</u> hearing the gunshots, she looked out of her window and saw Deputy Chenoweth standing and pointing his gun towards his patrol vehicle. Likewise, Ms. Strickland arrived on her porch <u>after</u> Deputy Chenoweth had already fired two shots.[5] Because neither of these witnesses saw the events leading up to the shooting, nor for that matter observed Ms. Cameron, they cannot say whether Ms. Cameron posed a threat of serious bodily injury to Deputy Chenoweth. Likewise, any discrepancies about who took Ms. Cameron's pulse after the shooting do not bear on the reasonableness of Deputy Chenoweth's use of deadly force.

Plaintiffs argue unpersuasively that this case is analogous to *Turk v. Bergman*, 685 Fed. Appx. 785 (11th Cir. 2017). In that case, officers responded to a call that Mr. Turk was considering suicide and might try to have the police kill him. The officers found Mr. Turk sitting in his car, with a gun lying in the passenger's seat. According to Mr. Turk, he heard a "startling voice" say "show us your gun." He grabbed his gun, but never raised it from his lap or pointed it at anyone or made any threatening moves. Mr. Turk then rolled down the rear passenger window and yelled, "What for? What's the point?" He then started to turn his head back towards the front and felt a bullet enter his right cheek. Mr. Turk picked up his cell phone with both hands and took a picture

---

[5] Plaintiffs incorrectly state that in light of Ms. Strickland's eye witness account, Deputy Chenoweth's expert, Steve Ijames, was unable to come up with a theory to absolve him of liability. (Doc. 50 at 2-3). To the contrary, Mr. Ijames opined that "[i]f it is assumed that Deputy Chenoweth was not fallen or prostrate on the ground as Ms. Cameron was reasonably believed to be armed with the TASER and pointing it at him, then the deadly force used would still be reasonable and not excessive." (Deposition of Deputy Chenowith, Exhibit 6, pg. 7).

of himself. He was shot again. The officers offered conflicting versions of events. Under those circumstances, the Eleventh Circuit held that summary judgment was entered in error because jury issues existed as to whether Mr. Turk posed an immediate threat of serious bodily harm to the officers. The instant case is readily distinguishable. Indeed, unlike in *Turk*, Deputy Chenoweth was faced with a confrontational suspect, who admitted to committing various crimes, attempted to hit him, and threatened him while holding what appeared to be a weapon. None of these circumstances were present in *Turk*.

Accordingly, with all of the facts viewed in a light favorable to Plaintiffs, Deputy Chenoweth's use of force was objectively reasonable and thus, Plaintiffs' claim fails. The Court does not mean to minimize the tragic nature of this case. However, no reasonable juror could find that the evidence of record calls into question: whether when Deputy Chenoweth first encountered Ms. Cameron, she admitted that she had just committed felony attempted arson and multiple misdemeanor batteries; whether when Deputy Chenoweth ordered her to stay so that he could figure out what was going on, Ms. Cameron attempted to hit him and her arm wrapped around his neck; whether while they were struggling on the ground, Ms. Cameron frantically reached at his shirt, belt, firearm, and taser; and whether when Ms. Cameron broke loose, she verbally threatened Deputy Chenoweth while pointing what appeared to be a weapon at him. Under these circumstances, Deputy Chenoweth acted reasonably by using deadly force and in so doing did not violate a constitutional right of Ms. Cameron. Plaintiffs are asking the Court to conduct the exact type of 20/20 hindsight inquiry against which the Supreme Court and this Court have repeatedly cautioned. The Court will not do that.

## IV.    RECOMMENDATION

For the reasons discussed above, the Court submits that Deputy Chenoweth's motion for summary judgment (Doc. 45) should be **GRANTED** because Deputy Chenoweth is entitled to qualified immunity.[6]

Recommended in Ocala, Florida on June 22, 2018.


_____
PHILIP R. LAMMENS
United States Magistrate Judge

Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy

---

[6] The District Judge also referred Defendant's motion to strike or in the alternative motion in limine to exclude witnesses at trial. (Doc. 43). Based on my recommendation that summary judgment should be granted, it is unnecessary to address this motion on the merits. It should be terminated as moot.

- 12 -